IN THE COURT OF APPEALS
STATE OF ARIZONA

FILED BY CLERK

FEB 28 2006

COURT OF APPEALS
DIVISION TWO

| | | |
|---|---|---|
| KYLE BOHSANCURT, | ) | 2 CA-CV 2005-0117 |
| | ) | DEPARTMENT A |
| Petitioner/Appellee, | ) | |
| | ) | O P I N I O N |
| v. | ) | |
| | ) | |
| THE HONORABLE MITCHELL | ) | |
| EISENBERG, Magistrate of the Tucson | ) | |
| City Court, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TUCSON CITY PROSECUTOR'S | ) | |
| OFFICE, | ) | |
| | ) | |
| Real Party in Interest/Appellant. | ) | |
| | ) | |

APPEAL FROM THE SUPERIOR COURT OF PIMA COUNTY

Cause No. C20051710

Honorable Barbara Sattler, Judge Pro Tempore

REVERSED AND REMANDED

Law Office of Stephen Paul Barnard, P.C.
  By Stephen Paul Barnard                                      Tucson
                                         Attorney for Petitioner/Appellee

Michael G. Rankin, Tucson City Attorney
  By Laura Brynwood and William F. Mills

Tucson
Attorneys for Real Party in
Interest/Appellant

Gary M. Kula, City of Phoenix Public Defender
  By Gary M. Kula and Treasure VanDreumel

Phoenix
Attorneys for Amicus Curiae
City of Phoenix Public Defender's Office

P E L A N D E R, Chief Judge.

¶1      The state appeals from the superior court's ruling in a special action in which the court concluded that maintenance and calibration records for an Intoxilyzer 5000 breath-testing machine are testimonial in nature under *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004). Based on that conclusion, the court ruled those records are inadmissible in the underlying criminal case against appellee Kyle Bohsancurt unless he has an opportunity to confront and cross-examine the author of the records. We hold that the records do not fall within the purview of *Crawford* and are admissible under the public records and business records exceptions to the hearsay rule. Therefore, we reverse the superior court's ruling and remand the case for further proceedings.

## BACKGROUND

¶2      The underlying facts are undisputed. Bohsancurt was cited for driving under the influence of an intoxicant (DUI) while impaired to the slightest degree in violation of A.R.S. § 28-1381(A)(1) and for driving or being in actual physical control of a vehicle with a breath-alcohol concentration of .08 or more within two hours of driving in violation of

2

§ 28-1381(A)(2). After those charges were filed in Tucson City Court, Bohsancurt moved in limine to exclude from evidence the periodic calibration and maintenance records ("quality assurance records" or "QARs") of the Intoxilyzer 5000 breath-testing device that had been used to test his breath sample. Under A.R.S. § 28-1323(A)(5), those records are a necessary foundational predicate for admission of Bohsancurt's breath test results.

¶3        In his motion, Bohsancurt argued the QARs are inadmissible unless he has an opportunity to cross-examine the Tucson Police Department (TPD) Crime Laboratory employee ("QA specialist") who conducted the calibration and maintenance tests on the Intoxilyzer. Without that opportunity, Bohsancurt argued, admission of the QARs will violate his constitutional rights under the Sixth Amendment's Confrontation Clause as explained in *Crawford*. The city court magistrate denied Bohsancurt's motion, finding the QARs are "non-testimonial" and "not of a nature that was sought to be protected by the Framers of the Constitution."

¶4        Bohsancurt then obtained a stay of the proceedings and filed a complaint for special action in superior court. In addition to his *Crawford* argument, Bohsancurt contended the QARs also should be excluded because they constitute inadmissible hearsay. The superior court accepted jurisdiction of the special action, finding that the complaint raised a purely legal issue of first impression in Arizona that is likely to recur. The court concluded that "[u]se of calibration records to lay a foundation for the admission of breath testing results when a witness is unavailable and the Defendant has not had prior opportunity to cross-examine the appropriate declarant . . . violates the Confrontation

3

Clause of the Sixth Amendment under *Crawford v. Washington*." It further found Bohsancurt's hearsay argument "not dispositive" because, under *Crawford*, "if testimonial in nature, the evidence must comport with the Confrontation Clause, regardless of its evidentiary label."

¶5 The state appeals from that ruling. This court has jurisdiction pursuant to A.R.S. § 12-2101(B) and (E) and Rule 8(a), Ariz. R. P. Spec. Actions, 17B A.R.S.

## DISCUSSION

### I

¶6 The state argues "[t]he lower court erroneously found that Intoxilyzer 5000 periodic maintenance records are testimonial under *Crawford*." That argument challenges the superior court's interpretation of *Crawford*, a purely legal issue that we review de novo. *See State v. Parks*, 211 Ariz. 19, ¶ 23, 116 P.3d 631, 636 (App. 2005) ("Although we review a trial court's ruling on the admissibility of evidence under exceptions to the hearsay rule for abuse of discretion, we review a trial court's determination of a Confrontation Clause violation de novo."); *see also State v. Moody*, 208 Ariz. 424, ¶ 62, 94 P.3d 1119, 1140 (2004).

¶7 In *Crawford*, the Supreme Court attempted to reconcile the inherent conflict between the Sixth Amendment's Confrontation Clause and the various exceptions to the general rule excluding hearsay evidence. The Court overruled *Ohio v. Roberts*, 448 U.S. 56, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), in which it had held that an unavailable declarant's "statement is admissible only if it bears adequate 'indicia of reliability[,]' . . .

4

[*i.e.,* it] falls within a firmly rooted hearsay exception[,] . . . [or has] particularized guarantees of trustworthiness." *Id.* at 66, 100 S. Ct. at 2539, 65 L. Ed. 2d at 608.

¶8        Emphasizing that "[r]eliability is an amorphous . . . concept," the Court in *Crawford* found the *Roberts* "framework . . . so unpredictable that it fail[ed] to provide meaningful protection from even core confrontation violations." *Crawford*, 541 U.S. at 62-63, 124 S. Ct. at 1371.  Instead, the Court analyzed the common law and historical context surrounding the Confrontation Clause and concluded the Framers had had two main concerns. *Id.* at 50, 124 S. Ct. at 1363.  First, the Court stated, "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.*  Second, the Court found "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54, 124 S. Ct. at 1365.

¶9        Significantly, the Court in *Crawford* for the first time distinguished between "testimonial" and "nontestimonial" evidence for Sixth Amendment purposes based on its reasoning that the Confrontation Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id*. at 51, 124 S. Ct. at 1364, *quoting* 1 Noah Webster, *An American Dictionary of the English Language* (1828).  As the Court explained, "'[t]estimony' . . . is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' An accuser who makes a formal statement to

5

government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.*

¶10     The Court adopted an absolute rule when "testimonial" evidence of a witness who does not appear at trial is involved—regardless of reliability, the evidence is inadmissible unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him or her. *Id.* at 68, 124 S. Ct. at 1374. Although the Court decided to "leave for another day any effort to spell out a comprehensive definition of 'testimonial,'" *id.,* it did describe a "core class of 'testimonial' statements," including,

> "*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially, extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions, statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," . . . [and] [s]tatements taken by police officers in the course of interrogations.

*Id.* at 51-52, 124 S. Ct. at 1364, *quoting* briefs in case and *White v. Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736, 747, 116 L. Ed. 2d 848, 865 (1992) (Thomas, J., concurring in part and concurring in judgment).

¶11     The Court held that the "testimonial" characterization "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial and to

police interrogations,"[1] reasoning that "[t]hese are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68, 124 S. Ct. at 1374. The Court provided further guidance by stating, "Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Id.* at 56, 124 S. Ct. at 1367. Finally, with respect to nontestimonial hearsay, the Court explained "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law," including "an approach that exempt[s] such statements from Confrontation Clause scrutiny altogether." *Id.* at 68, 124 S. Ct. at 1374.

## II

¶12 We now turn to the question of whether we should extend the Confrontation Clause protection to QARs because they supposedly are "testimonial" evidence and, therefore, inadmissible under *Crawford* absent an opportunity to cross-examine their author. The documents in question are created pursuant to R9-14-404 of the Arizona Administrative

---

[1]The evidence at issue in *Crawford* itself—a tape-recorded statement by the defendant's wife to the police—clearly fell within that category. During a police interrogation, the wife (an eyewitness to the crimes) made statements that did not support her husband's self-defense claim against charges of assault and attempted murder. 541 U.S. at 38-41, 124 S. Ct. at 1356-58. When the wife did not testify at trial because of the state marital privilege, the prosecution was permitted to introduce the wife's statements to the police under the state's statements-against-interest exception to the hearsay rule. *Id.* at 40, 124 S. Ct. at 1357-58. The Court in *Crawford* specifically held that admission of the wife's "testimonial statement against [her husband/defendant], despite the fact that he had no opportunity to cross-examine her," violated the Confrontation Clause. *Id.* at 68, 124 S. Ct. at 1374.

Code,[2] which requires "[l]aw enforcement agencies or individuals . . . who conduct alcohol concentration determinations by means of breath-testing devices [to] implement a quality assurance program conducted by a quality assurance specialist." The rule also directs "[c]alibration checks of breath testing devices . . . [every] 31 days . . . [and r]ecords of quality assurance testing, calibration checks, device adjustments, and any maintenance for each device in use." Ariz. Admin. Code R9-14-404(A)(3), (6).

¶13        Based on those rules, quality assurance testing is performed, and the resultant records are created by criminalists employed by TPD. The QARs are then used by the state in DUI prosecutions as foundation for admitting the defendant's breath test results. *See* A.R.S. § 28-1323. The applicable statute provides that breath tests conducted on DUI suspects "are admissible as evidence in any trial" as long as five "foundational requirements" are met, the last of which is:

> The device used to conduct the test was in proper operating condition. *Records of periodic maintenance that show that the device was in proper operating condition at a time before and after the test are admissible in any proceeding as prima facie evidence that the device was in proper operating condition at the time of the test. The records are public records.*

---

[2]Both parties state QARs were previously mandated by the Arizona Department of Health Services but have since become the subject of Department of Public Safety rules. But R9-14-404, Ariz. Admin. Code, falls under the title on "Health Services," and neither party cites any change to that. In addition, the title in the code on "Public Safety" does not reflect any change. Nonetheless, the focus of our analysis is not dependent on which state agency mandates the QARs, but rather, on which state agency actually conducts the calibration tests and prepares the records and on the essential purpose for which the records are prepared. That the QA specialists are employed by TPD is not disputed.

§ 28-1323(A)(5) (emphasis added).

¶14    As the state points out, the QARs "contain preprinted standard language, and within that standard language, the criminalist fills in the blanks.  The blanks include information such as the criminalist's name, the crime laboratory agency, and the date and time of the function and accuracy tests."  Based on the content of QARs, the state argues those reports "are . . . neither of the two clearly delineated types of [testimonial] statements [discussed in *Crawford*]:  prior *ex parte* testimony from a preliminary hearing, []or statements taken by police during interrogation."  Therefore, the state posits, "[t]he question necessarily becomes whether the records are of the more ambiguous type of 'testimonial' statement" mentioned but not defined in *Crawford*, which the state urges they are not.  Although the QARs are introduced in DUI cases to satisfy the fifth foundational requirement under § 28-1323, the state argues the information contained in those maintenance records "is not testimonial in nature, but is instead the **transference of data** from an Intoxilyzer 5000 printout onto a preprinted collection form."

¶15    Since *Crawford* was decided, other jurisdictions have grappled with the question of what constitutes "testimonial" evidence in cases like this in which the evidence at issue does not fit neatly into the "core class" discussed by the Supreme Court.  A clear majority of courts that have addressed the admissibility of similar quality assurance records for breath-testing machines have held this specific type of evidence is not testimonial.  *See, e.g., Rackoff v. State*, 621 S.E.2d 841, 845 (Ga. Ct. App. 2005); *Rembusch v. State*, 836 N.E.2d 979, 982 (Ind. Ct. App. 2005); *Napier v. State*, 820 N.E.2d 144, 149-50 (Ind. Ct.

9

App. 2005); *State v. Carter*, 114 P.3d 1001, ¶ 32 (Mont. 2005); *State v. Godshalk*, 885 A.2d 969, 973 (N.J. Super. Ct. Law Div. 2005); *State v. Dedman*, 102 P.3d 628, 636 (N.M. 2004); *People v. Kanhai*, 797 N.Y.S.2d 870, 875 (N.Y. Crim. Ct. 2005); *State v. Norman*, 125 P.3d 15, 18 (Or. Ct. App. 2005); *Luginbyhl v. Commonwealth*, 618 S.E.2d 347, 355 (Va. Ct. App. 2005).

**¶16** In many of those cases, courts found that calibration records are made and maintained in the ordinary course of business and, therefore, fall within a clearly delineated exception to *Crawford*—business records. *See Crawford*, 541 U.S. at 55, 124 S. Ct. at 1367 ("Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records . . . ."); *Godshalk*, 885 A.2d at 973 (inspection certificates are business records that *Crawford* "specifically excluded . . . from [its] scope"); *Kanhai*, 797 N.Y.S.2d at 874-75 (maintenance records were not testimonial because they were business records and because they were not made specifically for the case at issue); *Norman*, 125 P.3d at 19 (documents supporting accuracy of Intoxilyzer machine "are more akin to hearsay statements that were not considered testimonial in nature at common law, such as public or business records").

**¶17** The courts in the foregoing cases looked to legislation or administrative rules, similar to R9-14-404, that require the compilation of records of regular maintenance for various breath-testing devices. Based on such requirements, courts have found the maintenance records are not created in anticipation of litigation, but rather, for the purpose of complying with rules and assuring the accuracy of testing devices, which is a regular

10

course of business. *See Rackoff*, 621 S.E.2d at 845. Further, courts have concluded the records meet the other requirements of a business record in that the technician who conducts the calibration tests records the results at or near the time the testing is done and has firsthand knowledge of the information he or she is recording.[3] *See Kanhai*, 797 N.Y.S.2d at 872-73.

---

[3]Under Rule 803(6), Ariz. R. Evid., 17A A.R.S., a document qualifies as a business record, and is excepted from the hearsay rule even when the declarant is available as a witness, if the document was:

> (a) Made at or near the time of the underlying event,
>
> (b) by, or from information transmitted by, a person with first hand knowledge acquired in the course of a regularly conducted business activity,
>
> (c) made and kept entirely in the course of that regularly conducted business activity,
>
> (d) pursuant to a regular practice of that business activity; and
>
> (e) all the above are shown by the testimony of the custodian or other qualified witness, or by certification . . . .

The rule further provides:

> However, such evidence shall not be admissible if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness . . . .
>
> The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

11

¶18    In our view, similar reasoning applies here. Pursuant to R9-14-404, the Intoxilyzer 5000 machines must be tested and the results recorded every thirty-one days, regardless of whether any particular machine is used in connection with a DUI arrest. In other words, regardless of litigation, the QARs must be kept in the ordinary course of business. Bohsancurt asserts those records constitute "a declaration or affirmation for proving . . . the fact that the periodic maintenance was conducted, and the fact that the indicated calibration test results, et al[.], were obtained." That that may be true and that the records may subsequently be used in DUI prosecutions, however, does not preclude their qualifying as business records. *See Kanhai*, 797 N.Y.S.2d at 874.

¶19    Still, Bohsancurt argues that, even if kept in the regular course of business, the QARs cannot qualify as business records because their "method or circumstances of preparation indicate a lack of trustworthiness." Ariz. R. Evid. 803(6). He contends bias exists because "the QAR's are produced by the State for the State's prosecution of the defendant." Although the breath-testing machines are calibrated by criminalists employed by TPD, that fact alone is not sufficient to establish bias or inherent untrustworthiness.

¶20    We are persuaded by the reasoning of other courts that, because the maintenance records contain factual memorializations generated by a scientific machine, *see Kanhai*, 797 N.Y.S.2d at 874, and the records are prepared by technicians who are not proxies of police investigators and "have no demonstrable interest in whether the certifications produce evidence that is favorable or adverse to a particular defendant," *Norman*, 125 P.3d at 19, the records do not lack trustworthiness. That the calibration

12

records contain no opinion by the technicians further supports the conclusion that they are trustworthy. Clearly, regardless of any preconceived bias, an individual technician tests the machines and prepares all QARs in the same fashion. The QARs contain the results of machine tests that cannot be influenced by one's point of view.

¶21 We conclude that the QARs qualify as business records under Rule 803(6), Ariz. R. Evid.[4] And, although the legislature has characterized the maintenance records as "public records," § 28-1323(A)(5), that classification does not preclude them from also being business records. The essence of a public record is that it is created by a public agency. *See State ex rel. McDougall v. Johnson*, 181 Ariz. 404, 409, 891 P.2d 871, 876 (App. 1994). But, when a public agent keeps records in the ordinary course of business of his or her employer, the records may still constitute business records.[5] *See State v. Nez*, 950 P.2d 1289, 1294-95 (Idaho Ct. App. 1997) (probation records admissible under either

---

[4]At oral argument, Bohsancurt cited *Palmer v. Hoffman*, 318 U.S. 109, 114, 63 S. Ct. 477, 481, 87 L. Ed. 645 (1943), for the proposition that a report should not be admissible as a business record when it is "calculated for use essentially in the court" and its "primary utility is in litigating" rather than "for the systematic conduct of the enterprise." Even had *Palmer* been timely cited, however, "[w]hat the case has come to stand for is that a record otherwise meeting the requirements of th[e] exception [in Rule 803(8)(B)] ought not be admitted if there was a substantial motive to misrepresent when the report was prepared." Joseph M. Livermore, et al., *Law of Evidence* § 803.6, at 365 (4th ed. 2000); *see Mitchell v. Gamble*, 207 Ariz. 364, ¶ 16, 86 P.3d 944, 949-50 (App. 2001) ("Generally, issues and arguments raised for the first time at oral argument on appeal are untimely and deemed waived."). The record here does not reflect any such motive on the part of QA specialists when the Intoxilyzer calibration checks are performed or the QARs prepared.

[5]In its amicus curiae brief, the Phoenix Public Defender's Office challenges our conclusion, relying on *United States v. Sims*, 617 F.2d 1371, 1377 (9th Cir. 1980). We address that argument below. *See* ¶¶ 36-41, *infra*.

public records or business records exception); *State v. Rich*, 359 S.E.2d 281, 281 (S.C. 1987) (police fingerprint records admissible as either business records or public records).

¶22    In addition to finding that calibration records qualify as business records, other courts have permitted the admission of such records, without testimony from their preparer, by concluding that the evidence set forth in the records is not "against" any defendant. *See Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364 (the Confrontation Clause "applies to 'witnesses' against the accused"); *Rackoff*, 621 S.E.2d at 845 (breath-testing inspection certificates not testimonial because author of such certificates does not bear testimony against the defendant); *Carter*, 114 P.3d 1001, ¶ 32 ("Certification reports are nontestimonial in nature in that they are foundational, rather than substantive or accusatory."); *Green v. DeMarco*, No. 2005/09951, 2005 WL 3421707, *11 (N.Y. Sup. Ct. Dec. 12, 2005) (testimonial evidence involves only evidence that is inculpatory); *see also Michels v. Commonwealth*, 624 S.E.2d 675, 678 (Va. Ct. App. 2006) (adopting view of other courts that "documents establishing the existence or absence of some objective fact, rather than detailing the criminal wrongdoing of the defendant, are not 'testimonial'").

¶23    The reasoning and conclusions of those courts make practical sense in light of the historical protections *Crawford* sought to uphold. The Court explored the historical practice of justices of the peace or other court officials questioning witnesses, *ex parte*, and then merely reading the witnesses' statements into evidence. *See Crawford*, 541 U.S. at 43, 124 S. Ct. at 1359. The Court noted that those types of civil law "pretrial examinations became routine . . . during the reign of Queen Mary in the 16th century," *id.* at 43, 124

14

S. Ct. at 1360, and were the type of historical vice the Framers had intended to protect against. The Court further explained that "[j]ustices of the peace [who] conduct[ed] examinations . . . were not magistrates as we understand that office today, but had an essentially investigative and prosecutorial function." *Id.* at 53, 124 S. Ct. at 1365.

¶24 That the historical concern centered on statements taken by officials who were *prosecuting or investigating* criminal matters supports an inference that only inculpatory evidence required cross-examination. As did the city court magistrate in this case, several courts have concluded that the type of evidence contained in calibration records—primarily abstract data output from a machine with no relationship to a particular defendant—is not the sort of evidence with which the Framers were concerned. *See Napier*, 820 N.E.2d at 149-50 ("[I]t is our view that the inspection . . . certifications are simply not included in the class of evidence . . . identified by the *Crawford* court as 'the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.'"), *quoting Crawford*, 541 U.S. at 68, 124 S. Ct. at 1374; *Rembusch*, 836 N.E.2d at 982 (maintenance records not within class of evidence *Crawford* contemplated as testimonial); *Luginbyhl*, 618 S.E.2d at 355 ("Guided by . . . *Crawford* and the historical context in which it was rooted, . . . we hold that the statements in the breath test certificate relating to the machine's good working order . . . are not testimonial statements.").

¶25 In fact, several of the cases Bohsancurt cites, which hold that various laboratory reports are testimonial, involved reports that were inculpatory in a way that

calibration and maintenance records are not.[6] *See State v. Smith*, 898 So. 2d 907, 915-17 (Ala. Crim. App. 2004) (autopsy report of victim found testimonial, when cause of death was "a crucial element of the charge," because report stated death was caused by asphyxiation by use of plastic bag over victim's head and defendant, who admitted having killed victim in self-defense, claimed death was caused by blows to the head by a bat);[7] *Belvin v. State*, No. 4D04-4235, 2005 WL 1336497, **1, 6 (Fla. Dist. Ct. App. June 8, 2005) (*Crawford* requires officer who actually administers defendant's breath test to be available at trial);[8] *City of Las Vegas v. Walsh*, 124 P.3d 203, 207-08 (Nev. 2005) (nurse's affidavit describing conditions under which she had drawn blood *from the defendant* considered testimonial); *People v. Rogers*, 780 N.Y.S.2d 393, 396-97 (2004) (results of blood test of *victim* of crime considered testimonial, when state requested test to establish

---

[6]The superior court cited, and Bohsancurt relies heavily on, *Shiver v. State*, 900 So. 2d 615 (Fla. Dist. Ct. App. 2005). *See also Belvin v. State*, No. 4D04-4235, 2005 WL 1336497, at **4-5 (Fla. Dist. Ct. App. June 8, 2005). Although at first blush it appears *Shiver* dealt with records similar to Arizona's QARs, the Florida records actually included breath-test results of the individual defendant in addition to a section in which the officer who conducted the breath-test had certified that *another* officer had calibrated and checked the machine. 900 So. 2d at 618-19. Those facts are clearly distinguishable from those presented here. The records at issue in *Shiver* contained evidence against the defendant. Further, the Florida records would not necessarily qualify as business records because the calibration results were not recorded by someone with firsthand knowledge, nor does the case reflect that the records were made from information transmitted by a person with firsthand knowledge. *See* Ariz. R. Evid. 803(6)(b), 17A A.R.S.

[7]*Compare Perkins v. State*, 897 So. 2d 457, 464 (Ala. Crim. App. 2004) (in case decided on same day as *Smith*, same court held that autopsy reports generally are nontestimonial business records).

[8]*Belvin* has not been released for publication in permanent law reports. "Until released it is subject to revision or withdrawal." 2005 WL 1336497, at *1.

16

victim's intoxication and lack of consent in rape prosecution). In contrast to the types of reports involved in those cases, the recorded results of calibration testing in the abstract do not relate to any specific defendant or particular case.

¶26 Moreover, some courts have found other types of laboratory reports, even though related to specific defendants or victims, are not testimonial under *Crawford*. *See People v. Johnson*, 18 Cal. Rptr. 3d 230, 233 (Ct. App. 2004) (laboratory report analyzing rock cocaine that defendant had been seen selling not testimonial under *Crawford* because it "was not a substitute for live testimony," but "was routine documentary evidence"); *Commonwealth v. Verde*, 827 N.E.2d 701, 705-06 (Mass. 2005) (laboratory report that detailed weight of cocaine found in defendant's possession not testimonial because "[c]ertificates of chemical analysis are neither discretionary nor based on opinion; rather, they merely state the results of a well-recognized scientific test determining the composition and quantity of a substance"); *Moreno Denoso v. State*, 156 S.W.3d 166, 182 (Tex. Ct. App. 2005) (autopsy report describing victim's physical characteristics at death and cause of death not testimonial because it "d[id] not fall within the categories of testimonial evidence described in *Crawford*" as "[i]t [wa]s not prior testimony at a preliminary hearing, before a grand jury, or at a former trial").[9]

¶27 Arguably, reports analyzing evidence from crime victims or drug samples associated with a specific defendant are actually linked to a specific case and are likely

---

[9]This case does not require us to reach or decide the specific issues addressed in those cases.

17

inculpatory. Nonetheless, as noted above, courts have found those types of reports do not fall within the *Crawford* Court's description of evils the Confrontation Clause was intended to avoid. In our view, those authorities support our conclusion that QARs, which are business records created from objective, scientific data and which do not relate to any particular defendant or case, are not testimonial. If the Court in *Crawford* intended its description of "testimonial" evidence to include the types of maintenance records involved here, it certainly did not expressly say so and, absent more explicit direction from that Court or our supreme court, we are left with no more than "various levels of abstraction," an insufficient basis for finding any Sixth Amendment violation. *Crawford*, 541 U.S. at 52, 124 S. Ct. at 1364.

¶28 We are not persuaded by Bohsancurt's arguments that the seminal issue under *Crawford* is whether the declarant can reasonably anticipate that his or her statement will likely be used at trial. As noted earlier, the Court's "core class of 'testimonial' statements" included "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Id*. at 51-52, 124 S. Ct. at 1364, *quoting* Brief for Nat'l Ass'n of Crim. Defense Lawyers et al. as Amici Curiae at 3. Citing the legislative history of § 28-1323(5), Bohsancurt argues the "very purpose [of the subsection] is to provide a method in introducing necessary testimony as to the accuracy of the machine with[out] the need for live testimony."

¶29 We agree with Bohsancurt that QARs undoubtedly are created with an understanding that they may be used in court to verify the working conditions of

18

Intoxilyzers. But we do not think that abstract possibility renders QARs testimonial. The Court in *Crawford* did not specifically emphasize *any* of its stated "formulations" as determinative. 541 U.S. at 51-52, 124 S. Ct. at 1364. Further, in our view, the above formulation, as explained in *Crawford*, was directed at out-of-court statements aimed at a particular defendant or related to a specific case. This inference logically follows from the Court's discussion of the historical evils the Confrontation Clause sought to address—testimony obtained by court officials acting in prosecutorial or investigative roles. *See id*. at 53, 124 S. Ct. at 1365. Unless or until the Court states otherwise, it is not our prerogative to extend the Court's holding.

¶30 Bohsancurt relies on *United States v. Cromer*, 389 F.3d 662 (6th Cir. 2004), for the proposition that a declarant's knowledge that a statement may be used at trial is *the* dispositive issue under *Crawford*. But that case supports our conclusion that *Crawford* is concerned with out-of-court statements that are related to specific cases. The court in *Cromer* stated, "The proper inquiry [under *Crawford*] is whether the declarant intends to bear testimony against the *accused*." *Id.* at 675 (emphasis added). The court further explained, "That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id.* In other words, the court essentially concluded that, when a declarant intends to bear testimony against a specific person or is aware that the declarant's statement could be used against a defendant in a particular case,

19

then that intent or knowledge is a determinative factor in finding the declarant's out-of-court statement testimonial.

**¶31**		That cannot be said, however, with respect to the QA specialists who prepare QARs. As noted earlier, the QARs are mandated by administrative rule and created regardless of whether the machine to which the QAR relates is ever used or whether a single defendant is arrested. Moreover, the record does not reflect that a QA specialist has any way of knowing which records may be used in litigation and which will not or that a specialist necessarily intends to bear testimony against any specific defendant.[10]

**¶32**		We also find unpersuasive Bohsancurt's argument that the mere existence of an affidavit renders the QARs testimonial.[11] Other courts have dealt with calibration records

---

[10]Bohsancurt cites *People v. Orpin*, 796 N.Y.S.2d 512 (N.Y. Justice Ct. 2005), in which the court ruled that calibration records are testimonial because, although they qualify as business records, they simultaneously are created by law enforcement agents who expect the documents will be used in later prosecutions. *See id.* at 517 ("[W]hat matters under the *Crawford* analysis is that the declarant knows that the statement will be used in a prosecution[; o]nce this test is satisfied, the Confrontation Clause is implicated. . . ."). New York law, however, allows "the discretionary power of [a] supreme court to entertain an action for declaratory relief that, in effect, collaterally attacks a criminal court's interlocutory ruling in favor of a defendant." *Green v. DeMarco*, No. 2005/09951, 2005 WL 3421707, at *1 (N.Y. Sup. Ct. Dec. 12, 2005). The *Orpin* ruling was collaterally attacked pursuant to that rule, and the *DeMarco* court granted the district attorney's request and declared that calibration records are admissible and not a violation of *Crawford*. *See* 2005 WL 3421707, at *12. The *DeMarco* court also stated that, in New York, "except for *Orpin*, there are no other reported decisions excluding this type of documentary evidence on *Crawford* grounds." *Id.* at *12.

[11]A QA specialist signs and attaches to the forms associated with testing a document that states: "I hereby certify that the above and foregoing is a true and correct copy of the record of periodic maintenance and calibration checks for the Intoxilyzer Model 5000, Serial Number [#####], TPD No. [##], maintained by the Tucson Police Department Crime

that contain affidavits and have concluded, because the affidavit contains no testimony against any particular defendant, and indeed, no reference to any person at all, the affidavit does not render the calibration records testimonial. *See Napier*, 820 N.E.2d at 149 (affidavit is not testimonial because information within it "does not pertain to the issue of guilt"); *Luginbyhl*, 618 S.E.2d at 354 (officer's statements in affidavit were not testimonial because they did "not accuse [the defendant] of any wrongdoing").

¶33　　　Further, although the Court in *Crawford* cited affidavits among its "various formulations" of testimonial material, the Court apparently mentioned affidavits only in two specific contexts, neither of which is presented here. The first type of affidavit the Court considered testimonial was one that is the functional equivalent of ex parte, in-court testimony. *See Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364 ("Various formulations of this core class of 'testimonial' statements exist: [including] '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits' . . . ."), *quoting* Brief of Petitioner at 23. The ex parte statements the Court cited as offensive to the Sixth Amendment included investigative statements by magistrates who acted prosecutorially or statements by Lord Cobham, Sir Walter Raleigh's alleged accomplice. Lord Cobham implicated Raleigh in an examination before an ex parte council and in a letter. *See id.* at 44, 124 S. Ct. at 1360. The affidavits that accompany QARs, however, do not resemble a sworn memorialization of statements elicited ex parte to inculpate a defendant.

---

Laboratory, pursuant to the requirements of the Arizona Department of Health Services."

¶34 The second context in which the Court referred to affidavits was "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" *Id.* at 51-52, 124 S. Ct. at 1364, *quoting White v. Illinois*, 502 U.S. 346, 365, 112 S. Ct. 736, 747, 116 L. Ed. 2d 848, 865 (1992) (Thomas, J., concurring in part and concurring in judgment). As far as we can tell, the Court was merely describing various modes of civil law practice that it had addressed and criticized earlier. Again, the affidavits here do not resemble those with which the Court expressed concern. They are not created to formalize statements made at the behest of a party to document specific facts of the case. Rather, they are signed and completed in the ordinary course of business, solely in connection with the QARs themselves, and have no relationship to any specific case or defendant.

¶35 Based on our conclusions that QARs are business records and do not contain evidence against individual defendants such as Bohsancurt, we hold the QARs are not testimonial under *Crawford*. Therefore, the Sixth Amendment does not bar admission of the QARs even though the QA specialist who prepared them is not present in court or subject to cross-examination.[12]

## III

¶36 Although we have determined that the QARs qualify as business records and fall within that exception to the hearsay rule, we must address another hearsay argument

[12]Of course, nothing would prevent a defendant such as Bohsancurt from obtaining and serving a subpoena on a QA specialist, compelling his or her attendance at trial and subjecting the specialist to full examination on whatever QARs are relevant to the case.

22

raised by Bohsancurt and amicus curiae. Quoting *United States v. Sims*, 617 F.2d 1371, 1377 (9th Cir. 1980), amicus argues the QARs are not business records because the "plain language of [Rule] 803(8)[, Ariz. R. Evid., the public records hearsay exception] makes it abundantly clear that it is the rule which covers reports made by law enforcement personnel." Rule 803 states:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (8) . . . [u]nless the sources of information or other circumstances indicate lack of trustworthiness, records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth . . . (B) matters observed pursuant to a duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel . . . .

Bohsancurt and amicus argue the QARs are not admissible as public records because they include "matters observed by . . . law enforcement personnel."

¶37        It is generally recognized that records excluded by Rule 803(8)(B) cannot be admitted through the "back door" as a business record. *See United States v. Cain*, 615 F.2d 380, 382 (5th Cir. 1980) ("[S]tatements inadmissible as public agency reports under Rule 803(8) may not be received merely because they satisfy Rule 803(6)[;] . . . section (6) does not open a back door for evidence excluded by section (8)."). But it also is clear that a document admissible as a public record may likewise be characterized as a business record. *See Nez*, 950 P.2d at 1294-95; *Rich*, 359 S.E.2d at 281. Therefore, we must determine whether the QARs, although statutorily characterized as public records under § 28-1323(A)(5), are nonetheless inadmissible under Rule 803(8)(B).

23

¶38 Bohsancurt cites *United States v. Oates*, 560 F.2d 45 (2d Cir. 1977), in which the court concluded that chemists of the United States Customs Service were law enforcement personnel and, therefore, that their reports could not be admitted under the public records exception. *Id.* at 68. In *State v. Best*, 146 Ariz. 1, 703 P.2d 548 (App. 1985), however, this court followed the lead of several circuit courts in rejecting *Oates*, finding the "law enforcement personnel" exclusion in Rule 803(8)(B) is primarily aimed at observations made by police officers in adversarial roles, for example, when officers are investigating crime scenes or apprehending suspects. In *Best*, this court ruled that a laboratory report by a deceased fingerprint examiner that detailed where particular fingerprints had been lifted was admissible and not excluded under Rule 803(8)(B). 146 Ariz. at 4, 703 P.2d at 551. We stated:

> [L]ifting and recording is, for a fingerprint examiner, the type of routine daily task that has always been thought to be reliably done under both the business and official records exceptions to the hearsay rule[; t]he adversarial, confrontational risk of misperception and misrecording present at an arrest of a criminal at the scene of the crime is about as far removed from this routine exercise in a police laboratory as it is possible to imagine.

*Id*.

¶39 As noted, *Best* is consistent with decisions of other courts that have scrutinized and severely criticized *Oates*. *See United States v. Wilmer*, 799 F.2d 495, 500-01 (9th Cir. 1986) (expressly rejecting the *Oates* court's reasoning and concluding "calibration certificate was admissible under Rule 803(8)(B)" because "the exclusionary provisions of [that rule] were intended to apply to observations made by law enforcement officials at the

24

scene of a crime or the apprehension of the accused and not 'records of routine, nonadversarial matters' made in a nonadversarial setting"), *quoting United States v. Orozco*, 590 F.2d 789, 793 (9th Cir. 1979); *see also United States v. Hayes*, 861 F.2d 1225, 1229 (10th Cir. 1989) ("*Oates* has been criticized by both courts and commentators as an unduly broad interpretation of Rule 803(8)."); *United States v. Metzger*, 778 F.2d 1195, 1202 (6th Cir. 1985) ("[W]e now join the Second, Ninth and Eleventh Circuits in [refusing to apply] the restriction [in *Oates*].").[13]

**¶40** Amicus cites *State v. Meza*, 203 Ariz. 50, 50 P.3d 407 (App. 2002), for the proposition that criminalists who do calibration testing should be considered "law enforcement personnel" and, therefore, that the QARs fall within Rule 803(8)(B)'s exclusion. But that case makes clear "'a law enforcement agency *investigating a criminal action* operates as an arm of the prosecutor.'" 203 Ariz. 50, ¶ 21, 50 P.3d at 412 (emphasis added), *quoting Carpenter v. Superior Court*, 176 Ariz. 486, 490, 862 P.2d 246, 250 (App. 1993). Therefore, *Meza* is consistent with *Best* and with the majority of circuit courts and does not support the inference that any report generated by public safety employees is excluded under Rule 803(8)(B).

---

[13]*See also United States v. Rosa*, 11 F.3d 315, 332-33 (2d Cir. 1993) ("Notwithstanding the breadth of certain dicta in *Oates*, we are not persuaded that the term 'law enforcement personnel' as used in Rule 803(8)(B) should be read to encompass employees of the Medical Examiner's Office. [T]he . . . limitation in clause (B) was the result of Congressional discussion that focused exclusively on 'police officers,' and 'accuser[s],' and 'adversari[es],' and there was no suggestion that the amendment to clause (B) was meant to limit the admissibility of public reports in criminal cases . . . .") (second and third alterations in *Rosa*), *quoting* S. Rep. No. 1277, 93d Cong., 2d Sess. (1974), *reprinted in* 1794 U.S.C.C.A.N. 7051.

¶41     We do not equate the calibration testing and reporting by QA specialists with the type of "obser[vations] by police officers and other law enforcement personnel" that the exclusion in Rule 803(8)(B) addresses. *See Wilmer*, 799 F.2d at 500-01. Rather, the QARs are more analogous to the type of report generated in *Best*. Calibration testing and recording is a type of "routine daily task" that is "far removed" from any concerns associated with the adversarial circumstances surrounding investigations or arrests. *Best*, 146 Ariz. at 4, 703 P.2d at 551. Because the QA specialists who calibrate the Intoxilyzers and record the results are not investigating a particular criminal matter when they perform that function, the QARs qualify as both public records and business records—both recognized exceptions to the general exclusion of hearsay evidence. Accordingly, the superior court erred in reversing the city court magistrate's denial of Bohsancurt's motion in limine.

## DISPOSITION

¶42     The ruling of the superior court is reversed, and the case is remanded for further proceedings consistent with this decision.

_____
JOHN PELANDER, Chief Judge

CONCURRING:


_____
JOSEPH W. HOWARD, Presiding Judge

_____
GARYE L. VÁSQUEZ, Judge